[No. B135510. Second Dist., Div. Four. June 13, 2001.]

DENVER D. DARLING, INC., Plaintiff, Cross-defendant and Appellant,
v.
CONTROLLED ENVIRONMENTS CONSTRUCTION, INC., et al.,
Defendants, Cross-complainants and Appellants.

1222

1226

**COUNSEL**

Snell & Wilmer, Richard A. Derevan and Steven T. Graham for Plaintiff, Cross-defendant and Appellant.

Millar, Hodges & Bemis, Richard W. Millar, Jr., and David A. St. Clair for Defendants, Cross-complainants and Appellants.

**OPINION**

**VOGEL (C. S.), P. J.—**

### INTRODUCTION

Plaintiff Denver D. Darling, Inc., doing business as Darco Construction (Darco), a subcontractor, sued the general contractor, defendant Controlled Environments Construction, Inc. (Controlled) to recover the retention proceeds being withheld by Controlled. Darco also filed suit against Aetna Casualty & Surety Company of America (formerly Travelers' Insurance, referred to hereafter as Travelers), the surety on the statutory contractor's bond held by Controlled. Controlled counterclaimed, arguing that Darco failed to comply with contractual specifications regarding the flatness required for a concrete floor.

At trial, the court ruled that an ambiguity existed in the contract with regard to the flatness requirement. It awarded Darco its retention, but denied its request for statutory penalties and attorney fees. The trial court also refused to award to Controlled its expenses based on alleged abuse of the discovery process by Darco.

Controlled appeals from the judgment, including the denial of its request for expenses. In addition, Travelers appeals, contending the judgment in its favor should be modified to reflect that judgment in its favor not be conditioned upon Controlled's paying the judgment in full. We find no merit in the contentions asserted by Controlled on its appeal; as to Travelers,

however, we find the judgment must be modified to indicate that judgment is awarded in its favor without condition.

As to Darco's cross-appeal from the order denying its motion for attorney fees, we conclude that Controlled withheld more than 150 percent of the estimated value of the amount in dispute at the time it decided to withhold the retention payment from Darco. There was no bona fide dispute as to the excess amount withheld, and Darco is entitled to a 2 percent per month penalty on that amount and to its attorney fees as the prevailing party. We remand the matter to the trial court to make the factual determination of the amount in dispute at the relevant time.

### FACTUAL AND PROCEDURAL BACKGROUND

U.S. Growers entered into a contract with Controlled under which the latter would serve as the general contractor for construction of a 120,000-square-foot cold storage facility. Controlled entered into a subcontract with a structural engineering firm, McLean and Shultz, to design the facility's concrete structures. Darco performed the structural concrete construction pursuant to a subcontract it entered into with Controlled. The concrete finishing work was performed by Larry Littlejohn pursuant to an oral subcontract between him and Darco.

The cold storage facility is fronted by a large loading dock, the floor of which is a suspended concrete slab. Trucks deliver or load goods at the loading dock; the frozen goods are moved across the loading dock to and from the refrigerated warehouse by pallet jacks and forklifts. In the freezer area of the warehouse there are large, mobile storage racks which move on rails set into the concrete freezer floor. At issue here is the finish of the loading dock floor, which Controlled contends is too uneven, allegedly in violation of a contractual specification that the flatness of all finished uniform surfaces not exceed a variation of one-eighth inch in 12 feet. Controlled withheld Darco's retention in the amount of $101,580.45, demanding that Darco correct the dock floor. Darco paid $15,000 to have the floor ground, but the result was still not to Controlled's satisfaction.

Darco filed the present lawsuit to recover its retention, alleging common count theories of recovery, breach of contract, violation of Business and Professions Code section 7108.5, and asserting a claim on Controlled's licensing bond against Aetna Casualty & Surety Company of America (formerly Travelers' Insurance). In its second amended complaint, Darco added a cause of action for violation of Civil Code section 3260.

Controlled answered the second amended complaint with a general denial, and cross-complained for specific performance, seeking to compel Darco to

bring the dock floor to the alleged specification requiring that it not vary more than one-eighth of an inch as measured with a 12-foot straight edge. Darco answered the cross-complaint with a general denial.

A bench trial was held, during which Darco took the position that the contract did not require that the one-eighth inch in 12-foot specification apply to the dock floor, but rather that specification only applied to the freezer floor. At the conclusion of trial, the court ruled that Darco was entitled to recover the full amount of its retention. The court denied Controlled's motion for expenses based on Darco's alleged failure to admit during discovery that the dock floor did not meet the one-eighth inch in 12-foot specification, whereas at trial it admitted that the floor was not completed according to that specification. The trial court also refused to award to Darco a penalty and attorney fees pursuant to Civil Code section 3260. The judgment stated that Darco was to take nothing against Travelers, the surety on the contractors' bond held by Controlled, provided the judgment awarded to plaintiff is paid in full.

Controlled appeals from the judgment in Darco's favor, and from the denial of its motion for expenses for alleged discovery abuse. Travelers appeals, objecting to the conditional nature of the judgment in its favor.

Darco cross-appealed from the judgment based on the trial court's refusal to award the statutory penalty and attorney fees.

## DISCUSSION

### I. *Licensing Requirements*

Controlled contends that Darco did not hold the type of contractor's license required to perform the subcontract at issue, and thus should not be permitted to recover compensation for performance of the contract.[1]

Contractors are divided into three categories: general engineering contracting, general building contracting, and specialty contracting. (§ 7055.) Darco holds a class B general contractor's license. (See Cal. Code Regs., tit.

---

[1]Business and Professions Code section 7031 provides: "(a) Except as provided in subdivision (d), no person engaged in the business or acting in the capacity of a contractor, may bring or maintain any action, or recover in law or equity in any action, in any court of this state for the collection of compensation for the performance of any act or contract for which a license is required by this chapter without alleging that he or she was a duly licensed contractor at all times during the performance of that act or contract, regardless of the merits of the cause of action brought by the person, except that this prohibition shall not apply to

16, § 830, subd. (a).) Section 7057, subdivision (a) provided during the relevant time period that "a general building contractor is a contractor whose principal contracting business is in connection with any structure built, being built, or to be built, for the support, shelter, and enclosure of persons, animals, chattels, or movable property of any kind, requiring in its construction the use of more than two unrelated building trades or crafts, or to do or superintend the whole or any part thereof. [¶] This does not include anyone who merely furnishes materials or supplies under Section 7045 without fabricating them into, or consuming them in the performance of work of the general building contractor."[2]

The contractors licensing requirements are administered by the Contractors' State License Board (Board), which is given general authority to adopt rules and regulations reasonably necessary to carry out the provisions of the licensing law. (§§ 7000.5, 7008.) Pursuant to that authority, the Board had adopted California Code of Regulations, title 16, section 834. Former section 834, subdivision (b)[3] provided: "A licensee classified as a general building contractor, as defined in Section 7057 of the Code, shall not take a prime contract (excluding framing and carpentry) unless it requires at least three unrelated building trades or crafts, or unless he/she holds the required specialty license(s). A general building contractor shall not take a subcontract (excluding framing or carpentry) involving less than three unrelated trades or crafts unless he/she holds the required specialty license(s)." (See *Home Depot, U.S.A., Inc. v. Contractors' State License Bd.* (1996) 41 Cal.App.4th 1592, 1599 [49 Cal.Rptr.2d 302].)

In its opening brief, Controlled contends that Darco, as a general building contractor, was not permitted to take the subcontract at issue here because it

---

contractors who are each individually licensed under this chapter but who fail to comply with Section 7029. . . ."

The exception found in section 7031, subdivision (d), regarding "substantial compliance" with the licensing requirement, is not applicable here because Darco never held the specialty license which Controlled asserts it was required to have.

All further statutory references are to the Business and Professions Code unless indicated otherwise.

[2]In contrast, a class A contractor's license is for general engineering contractors whose principal contracting business deals with "fixed works requiring specialized engineering knowledge and skill." (§ 7056.) A class C contractor's license is for specialty contractors "whose operations involve the performance of construction work requiring special skill and whose principal contracting business involves the use of specialized building trades or crafts." (§ 7058, subd. (a).) The numerous subclassifications of specialty contractors are listed in California Code of Regulations, title 16, section 832. Controlled contends Darco was required to hold a class C-8 specialty license for concrete contractors. (See Cal. Code Regs., tit. 16, § 832.08.)

[3]Section 834, subdivision (b) of California Code of Regulations, title 16, is hereinafter referred to as section 834(b).

did not involve *at least two* unrelated trades and Darco did not hold a specialty license. It bases this position not on section 834(b) (which requires involvement of *at least three* unrelated trades), but on the amended version of section 7057, which came into effect in January 1998, after the contract at issue here was performed.[4]

---

[4]During 1997, the Legislature amended the first sentence of section 7057, as follows: "*(a) Except as provided in this section,* a general building contractor is a contractor whose principal contracting business is in connection with any structure built, being built, or to be built, for the support, shelter, and enclosure of persons, animals, chattels, or movable property of any kind, requiring in its construction the use of *at least* two unrelated building trades or crafts, or to do or superintend the whole or any part thereof." (Amendments appear in italics.) The Legislature also added subdivision (b), which states: "A general building contractor may take a prime contract or a subcontract for a framing or carpentry project. However, a general building contractor shall not take a prime contract for any project involving trades other than framing or carpentry unless the prime contract requires at least two unrelated building trades *or crafts other than framing or carpentry, or unless the general* building contractor holds the appropriate specialty license or subcontracts with an appropriately licensed specialty contractor to perform the work. A general building contractor shall not take a subcontract involving trades other than framing or carpentry, unless the subcontract requires at least two unrelated trades or crafts other than framing or carpentry, or unless the general building contractor holds the required specialty license. The general building contractor may not count framing or carpentry in calculating the two unrelated trades necessary in order for the general building contractor to be able to take a prime contract or subcontract for a project involving other trades."

In enacting the amendment the Legislature noted: "(a) It is the intent of the Legislature to amend Section 7057 of the Business and Professions Code in order to modify the holdings in Home Depot, U.S.A., Inc. v. Contractors' State License Bd., [*supra,*] 41 Cal.App.4th 1592, and Hazard, Jr., Enterprises, Inc. v. Insurance Co. of the West [(1997)] 52 Cal.App.4th 1088 [60 Cal.Rptr.2d 921], *to the extent the courts' holdings, or the courts' statutory construction* of Section 7057 of the Business and Professions Code, are inconsistent with this act.

"(b) The limitations applicable to general building contractors performing in the role of specified specialty building contractors for which other standards and criteria have been established, are necessary to serve as a means of protecting the public against contractors who have not demonstrated competence in specified specialty aspects of work for which a specialty license is required and as a means of facilitating the selection and provision of contracting services by and for the public that provides recognition to those persons or entities that have demonstrated experience, competence, and appropriate qualifications in those specialties specified in Section 7057 of the Business and Professions Code. In addition, experience has shown that consumers need and deserve to be protected against work being performed by contractors not licensed in specialty areas, and that the majority of consumer abuses occur and the focus of enforcement is needed most in these areas.

"(c) The Legislature finds and declares that the administrative regulation adopted by the Contractors' State License Board as subdivision (b) of Section 834 of Title 16 of the California Code of Regulations had, for over four decades, served the public good by prohibiting general building contractors from undertaking certain projects in aspects of construction work in which specialty licenses had been established, until that regulation was ruled invalid as a result of the Home Depot and Hazard cases. It is the intent of the Legislature by enacting this act to statutorily establish the standard promulgated as subdivision (b) of Section 834 of Title 16 of the California Code of Regulations, with changes incorporated in this enactment, on the basis that the experience of license enforcement has

Regarding section 834(b), as Darco points out in its respondent's brief, and as Controlled concedes in its reply brief, in January 1996, an appellate court held that section 834(b) was inconsistent with the language of section 7057. In *Home Depot, U.S.A., Inc. v. Contractors' State License Bd., supra,* 41 Cal.App.4th 1592, the court held that the statutory definition of a general building contractor set forth in section 7057 "does not limit a general building contractor's operation *solely* to contracts involving more than two unrelated building trades or crafts. If the Legislature intended to impose such a limitation it would have done so. The language of section 7057 allows a general building contractor to accept contracts that require the use of two or fewer building trades or crafts and still be acting within this license classification so long as the contractor's *principal* contracting business is in connection with structures that require the use of two or more unrelated building trades or crafts in their construction." (41 Cal.App.4th at p. 1601, italics in original.) "When read in its entirety, the language of section 7057 clearly provides that those contractors who principally work on structures that involve more than two unrelated building trades or crafts are to be classified as general building contractors. Nothing in the language of section 7057 requires a general building contractor to absolutely limit his or her contracting work to projects involving more than two unrelated building trades or crafts." (*Ibid.*) The *Home Depot* court held the regulation set forth in section 834(b) to be invalid and in excess of the Board's rulemaking authority. (41 Cal.App.4th at p. 1607.)

The subcontract between Darco and Controlled is dated March 1996. Darco performed work on the job from May 1996 to December 1996. U.S. Growers occupied the facility in January 1997, and a notice of completion for the project was recorded in May 1997. As noted, during 1997 the Legislature amended section 7057 in response to the *Home Depot* case, but that amendment did not come into effect until January 1998. Thus, the version of section 7057 that is applicable to the subcontract at issue defined a general building contractor as one "whose principal contracting business is in connection with any structure . . . requiring in its construction the use of more than two unrelated building trades or crafts, or to do or superintend the whole or any part thereof."

Suffice it to say that we are in agreement with the *Home Depot* court, that the pre-1998 "language of section 7057 allows a general building contractor

---

demonstrated that the majority of consumer abuses occur and the focus of enforcement is most needed in smaller jobs involving one or two specialty trades that typically comprise service or repair functions and home improvement jobs. The Legislature also reiterates its previously stated intent that the Contractors' State License Law should be administered to 'promote and protect the interests of consumers as well as law-abiding competitive licensed contractors' (Section 34.5 as contained in Chapter 1013 of the Statutes of 1979)." (Stats. 1997, ch. 812, § 9 (Sen. Bill No. 857).)

to accept contracts that require the use of two or fewer building trades or crafts and still be acting within this license classification so long as the contractor's *principal* contracting business is in connection with structures that require the use of two or more unrelated building trades or crafts in their construction." (*Home Depot, U.S.A., Inc. v. Contractors' State License Bd., supra,* 41 Cal.App.4th at p. 1601, italics in original.) Therefore, the regulation adopted by the Board as (former) section 834(b) was inconsistent with section 7057 and imposed restrictions on general building contractors that were not warranted by the unambiguous wording of the statute.

While the 1997 legislative amendment of section 7057 is noteworthy, and the Legislature clearly expressed its approval of former section 834(b), the Legislature did not, and could not, state or imply that the amendment was declaratory of previously existing law. ■ "The courts will not infer that the Legislature intended only to clarify the law unless the nature of the amendment clearly demonstrates that this is the case [citation] or the Legislature itself states in a particular amendment that its intent was to be declaratory of the existing law. [Citation.]" (*Verreos v. City and County of San Francisco* (1976) 63 Cal.App.3d 86, 99 [133 Cal.Rptr. 649].) Further, "where the language of a statute is clear and unambiguous, amendments thereto will not be considered by the courts in determining its meaning. [Citation.]" (*Ibid.*) ■ The former version of section 7057 was clear and unambiguous, and rendered the restrictions imposed by former section 834(b) invalid. The amendment's incorporation of an altered version of former section 834(b) into section 7057 effected an undeniably substantive change in the law. In addition, we note that the Legislature changed the requirement regarding the number of unrelated building trades or crafts from "more than two" to "at least two," thus clearly effecting a further substantive change in the law. We therefore find ourselves in the same position as did the *Home Depot* court in determining the meaning and effect of the applicable law with regard to the subcontract before us. The 1997 amendment does not provide us with any indication of legislative intent regarding the previous version of the statute which could alter the clear meaning of the statutory language.

To demonstrate that a class B general building contractor's license was appropriate for this project, Darco therefore had to show that its "principal contracting business is in connection with any structure . . . being built . . . requiring in its construction the use of more than two unrelated building trades or crafts . . . " At trial it presented evidence that it does concrete construction, as well as general contracting such as building industrial warehouses and concrete "tilt up." It typically uses about 11 subcontractors

on its projects. On the U.S. Growers project, Darco used a "sack and patch" subcontractor, a finishing work subcontractor, a rebar subcontractor, a welding subcontractor, a crane supplier, and a concrete supplier. We are satisfied that Darco was duly licensed to perform the subcontract. Aside from the issue of which version of section 7057 applies, we note that the main objective of the legislation appears always to have been protection of consumers with regard to smaller construction projects and not larger ones that involve multiple trades or crafts. (See *Home Depot U.S.A., Inc. v. Contractors' State License Bd., supra,* 41 Cal.App.4th at p. 1605.) This subcontract, which involved multiple sub-subcontractors and total payment to Darco of about $1 million, is not the type of project with which the legislation is concerned.

## II. *Parol Evidence*

Paragraph 11 of the subcontract stated: "Subcontractor is to furnish and install all material and equipment related to the work including, but not limited to the following: . . . . 8. Finished uniform surfaces measured with a twelve (12) foot straight edge should not vary by more than 1/8". Floor flatness @ frezzer [*sic*] will be dictated by rail elevation." The latter sentence was handwritten by Denver Darling, the president of Darco.

Controlled contends on appeal that the trial court erred in allowing Darling to offer extrinsic oral testimony which contradicted the plain, unambiguous meaning of subparagraph 8. We disagree.

Code of Civil Procedure section 1856, subdivision (a) (the parol evidence rule) provides that "[t]erms set forth in a writing intended by the parties as a final expression of their agreement with respect to such terms as are included therein may not be contradicted by evidence of any prior agreement or of a contemporaneous oral agreement." Subdivision (g) of section 1856 provides, however, that "[t]his section does not exclude other evidence of the circumstances under which the agreement was made or to which it relates, as defined in Section 1860, or to explain an extrinsic ambiguity or otherwise interpret the terms of the agreement . . . ." Code of Civil Procedure section 1860 provides: "For the proper construction of an instrument, the circumstances under which it was made, including the situation of the subject of the instrument, and of the parties to it, may also be shown, so that the Judge be placed in the position of those whose language he is to interpret." Finally, Civil Code section 1647 reads: "A contract may be explained by reference to the circumstances under which it was made, and the matter to which it relates."

Darling testified that the one-eighth inch flatness standard applied only to the freezer floor, not to the dock area. In the freezer, there were rails on which mobile racks were to be used, and the floor needed to be very level so the rack system would work properly. The rails were installed by Controlled, not Darco, so Darling wanted to specify that the flatness he could achieve would be dependent on the rail elevation. Darling explained that a "super flat" floor is needed in areas with very defined traffic patterns, such as where wire-guided fork trucks or high turret fork trucks are used. Littlejohn, Darco's subcontractor who actually performed the work at issue, testified to the same effect.

As to the dock floor, Darling testified that "It simply didn't make sense to apply it [the flatness standard] to that category of work." The dock is suspended (with a subterranean garage beneath it) and therefore is built with shoring and support columns underneath it, and the concrete would therefore settle and shrink. It would not be possible to make the suspended dock as flat as the one-eighth inch in 12-foot requirement with the design used. In addition, the traffic pattern over the dock floor is random. Fork trucks do not move over it on fixed rails or wires and therefore the floor does not need to be super flat. Nothing in the subcontract, the drawings, or the structural sheets indicated to Darling that U.S. Growers was seeking a super flat floor in the dock area.[5] Darling testified that he received no complaints from U.S. Growers regarding the concrete work.

In contrast, Rudy Viramontes, Controlled's project manager and the person who added subparagraph 8 to the subcontract, testified that he intended the one-eighth inch in 12-foot flatness standard to apply to every uniform finished concrete surface.

Controlled relies on the "plain meaning" rule, that parol evidence is not admissible when the contract is clear or unambiguous, and cannot be used to itself create the ambiguity. For this rule to be applicable it must be held, as a matter of law, that subparagraph 8 is so clear that reasonable minds cannot differ as to its interpretation, and that it means only one thing. We do not find this to be the case. In the context of a building contract, we cannot say that it is self-evident and unambiguous that all concrete surfaces in a cold storage facility would be required to meet a high degree of flatness.[6] The sentence added by Darling (and agreed to by Controlled) in subparagraph 8

---

[5]Controlled did not object to Darling's testimony regarding his understanding of the subcontract at the time the testimony was given, but only did so after Darco rested. The court ruled that the evidence would stand.

[6]Civil Code section 1645 provides: "Technical words are to be interpreted as usually understood by persons in the profession or business to which they relate, unless clearly used

referred to the freezer floor and particularly to the rails, as did the two subparagraphs that followed.[7] Extrinsic evidence was thus appropriate to assist the court in ascertaining what intent the parties had with regard to subparagraph 8.

■ "Since the phrase is capable of two meanings, parol evidence is admissible to explain it. As th[e] court stated in *Bartel v. Associated Dental Supply Co.* [(1952)] 114 Cal.App.2d 750, 752 [251 P.2d 16]: 'Unless a court can "to a certainty and with sureness by a mere reading of the document, determine which is the correct interpretation . . . extrinsic evidence becomes admissible as an aid to interpretation. . . ." (*MacIntyre v. Angel* [(1952)] 109 Cal.App.2d 425, 429 [240 P.2d 1047].)' [¶] The same rule was expressed in *Barham v. Barham* [(1949)] 33 Cal.2d 416, at page 422 [202 P.2d 289], in the following language: 'When the language used is fairly susceptible to one of two constructions, extrinsic evidence may be considered, not to vary or modify the terms of the agreement but to aid the court in ascertaining the true intent of the parties [citation], not to show that "the parties meant something other *than* what they said" but to show "what they meant *by* what they said." ' " (*Asso. Lathing etc. Co. v. Louis C. Dunn, Inc.* (1955) 135 Cal.App.2d 40, 46-47 [286 P.2d 825], italics in original.) ■ The court did not err in admitting the extrinsic evidence.

The trial court concluded that subparagraph 8 was ambiguous, and "there was no meeting of the minds between plaintiff and defendant as to what the contractual specification was for the suspended dock floor. Therefore, the plaintiff did not breach the subcontract by failing to perform to the defendant's interpretation of what the contractual specification was when the defendant did not establish that the contractual specification of 1/8" in 12 feet applied to the suspended dock floor. As such, it cannot be said that the plaintiff or defendant breached the subcontract." The trial court determined that both interpretations were reasonable, and therefore neither party breached the subcontract. We are bound by that determination to the extent that it rested on disputed factual matters.

Having determined that there was no meeting of the minds as to the required flatness of the dock floor, the court still was left to resolve the

in a different sense." The testimony given by Darling was aimed at just that: explaining when a super flat floor is ordinarily specified in the building industry.

[7]Subparagraph 9 read: "Ensure that the finished floor level between the tracks and rails in the Freezer will not be more than 1/8" above the top running surface of the track." Subparagraph 10 read: "Ensure that all concrete is properly vibrated. Special attention must be given when pouring around the tracks and rails in the Freezer to ensure that there are no voids left around these items."

remaining ambiguity. In some instances a purported contract that lacks mutuality of obligation might be held to be no contract at all and thus unenforceable. (See 1 Witkin, Summary of Cal. Law (9th ed. 1987) Contracts, § 146, p. 169.) Civil Code section 1598 provides: "Where a contract has but a single object, and such object is . . . so vaguely expressed as to be wholly unascertainable, the entire contract is void."

■ Failure of mutuality of obligation as to one matter within an extensive building contract, however, does not render the entire contract unenforceable. " '[T]he modern trend of the law is to favor the enforcement of contracts, to lean against their unenforceability because of uncertainty, and to carry out the intentions of the parties if this can feasibly be done. Neither law nor equity requires that every term and condition of an agreement be set forth in the contract. [Citations.] The usual and reasonable terms found in similar contracts can be looked to, unexpressed provisions of the contract may be inferred from the writing, external facts may be relied upon, and custom and usage may be resorted to in an effort to supply a deficiency if it does not alter or vary the terms of the agreement. [Citations.]' [Citations.] At bottom, '[i]f the parties have concluded a transaction in which it appears that they intend to make a contract, the court should not frustrate their intention if it is possible to reach a fair and just result, even though this requires a choice among conflicting meanings and the filling of some gaps that the parties have left. [Fn. omitted.]' (1 Corbin on Contracts (1963) § 95, p. 400.)" (*Larwin-Southern California, Inc. v. JGB Investment Co.* (1979) 101 Cal.App.3d 626, 641 [162 Cal.Rptr. 52].)

■ In this case, the trial court relied on external facts and custom and usage in the building industry in order to supply the deficiency left by the parties' failure to agree on the flatness requirement. Here, the industry custom and plaintiffs' adherence to it were established at trial by testimony from Darling and Littlejohn that the dock floor met industry standards for such construction. Further, the court had before it evidence that U.S. Growers has been using the dock for some time for its intended purpose and is fully satisfied with it. The only party dissatisfied with the dock is Controlled.

The trial court made the following factual findings, which facts Controlled does not dispute: U.S. Growers paid all sums due to Controlled and had not complained to either Darco or Controlled about the flatness of the dock. U.S. Growers had been using the dock since January 1997 without complaint. The dock is structurally sound and meets the industry standards for the intended use of the floor. The court ruled that Controlled did not suffer any injury because of Darco's work, and there was no evidence of possible future litigation between Controlled and the owner regarding the dock floor.

Thus, the court in essence supplied a reasonable term where the parties had failed to reach an agreement: the floor had to meet industry standards and be suitable for the building owner's use. The court explicitly held, however, that it charged neither party with breach of the contract because both parties' interpretations of the contract were reasonable. In fashioning a remedy which would effect justice under the circumstances, the court sensibly determined that Darco was entitled to the full amount of retention withheld by Controlled because Darco provided a dock floor in keeping with industry standards and suitable for U.S. Growers' use, and Controlled failed to demonstrate that it was in any way harmed.[8] The judgment was amply supported by the applicable law of contracts and by the evidence.

## III. *Motion for Expenses*

■ Controlled propounded a request for admission to Darco which stated: "Admit that the dock floor was not completed by you in accordance with the contractual specifications." Darco denied the request. In response to a form interrogatory, Darco explained that it based its denial on the following facts: "[t]he dock floor is structurally sound and well within industry standards in all respects"; a consultant engaged by Darco determined the floor to be within the contractual specification; another expert measured the dock floor for flatness and testified that it met the contract specifications, was very acceptable, and was totally satisfactory for the use for which it was intended. At trial, Darco readily agreed that the dock floor did not meet the one-eighth inch in 12-foot standard, but maintained that it met industry standards as required.

At the end of the trial, Controlled brought a motion to compel Darco to pay Controlled's expenses incurred in proving that the loading dock did not

---

[8]Darco contends that, even putting aside the extrinsic evidence demonstrating an ambiguity in the contract term, the judgment in its favor is supported by the court's finding that Darco substantially complied with the terms of the contract.

The doctrine of substantial performance, on which Darco relies, is as follows: "At common law, recovery under a contract for work done was dependent upon complete performance, although hardship might be avoided by permitting recovery in *quantum meruit*. The prevailing doctrine today, which finds its application chiefly in building contracts, is that *substantial performance* is sufficient, and justifies an action on the contract, although the other party is entitled to a reduction in the amount called for by the contract, to compensate for the defects. What constitutes substantial performance is a question of fact, but it is essential that there be no wilful departure from the terms of the contract, and that the defects be such as may be easily remedied or compensated, so that the promisee may get practically what the contract calls for." (1 Witkin, Summary of Cal. Law, *supra*, Contracts, § 762, p. 690.)

That doctrine is not applicable here, where the court found that *Darco did not depart from the terms of the contract*; but rather, the parties did not reach *any* agreement on the contractual term at issue.

meet the one-eighth inch in 12-foot standard. The court denied the motion, stating: "[T]he court felt that was an ambiguity within the contract as to what and the manner that the dock floor was to be completed and that therefore technically that request could not be admitted as such because there was an ambiguity since there was a difference between what the plaintiff believed that the contract called for concerning the dock floor and what the defendant believed it called for."

Controlled contends on appeal that the trial court abused its discretion in denying the motion for expenses. It urges that if Darco was going to take the position that there was an ambiguity in the contract as to the specification for the dock floor, the time to do that was during discovery, and its failure to do so indicates that the ambiguity explanation was fabricated for purposes of the trial. According to Controlled, Darco's discovery response that the dock floor met the contract specifications was misleading when at trial Darco contended that the contract did not provide a specification for the flatness of the dock floor.

We reject this argument. Darco's position was not that the contract is ambiguous but rather that it unequivocally requires a one-eighth inch in 12-foot standard for the freezer floor, conditional on the rail elevations, and by implication the flatness of the other floors was to be within industry standards for the design and intended uses of the other areas. The trial court did not adopt Darco's position and instead found that the contract is ambiguous, but it found that each party reasonably believed the contract unambiguously meant something different than the other believed it meant. As the court found Darco's position to be reasonable, it denied the motion for expenses. We find the court acted well within the limits of sound discretion. (*Brooks v. American Broadcasting Co.* (1986) 179 Cal.App.3d 500, 508 [224 Cal.Rptr. 838].)

IV. *Civil Code Section 3260*[9]

Section 3260, pursuant to which Darco alleged a cause of action against Controlled, provides in relevant part: "(b) The retention proceeds withheld from any payment . . . by the original contractor from any subcontractor[] shall be subject to this section.

"(c) Within 45 days after the date of completion, the retention withheld by the owner shall be released. . . .

"(d) Subject to subdivision (e), within 10 days from the time that all or any portion of the retention proceeds are received by the original contractor,

---

[9]Hereinafter all references to section 3260 are to Civil Code section 3260.

the original contractor shall pay each of its subcontractors from whom retention has been withheld, each subcontractor's share of the retention received. . . .

"(e) If a bona fide dispute exists between a subcontractor and the original contractor, the original contractor may withhold from that subcontractor with whom the dispute exists its portion of the retention proceeds. The amount withheld from the retention payment shall not exceed 150 percent of the estimated value of the disputed amount. [¶] . . . [¶]

"(g) In the event that retention payments are not made within the time periods required by this section, the owner or original contractor withholding the unpaid amounts shall be subject to a charge of 2 percent per month on the improperly withheld amount, in lieu of any interest otherwise due. Additionally, in any action for the collection of funds wrongfully withheld, the prevailing party shall be entitled to his or her attorney fees and costs."

The trial court found that there was a bona fide dispute between Darco and Controlled as to the meaning of subparagraph 8 of paragraph 11, and Controlled was thus entitled to withhold Darco's portion of the retention proceeds. Because a bona fide dispute existed, the time periods for payment of the retention set forth in section 3260 did not apply, and the unpaid amount was not subject to a charge of 2 percent per month. (§ 3260, subd. (g).)

The trial court also denied Darco's request for attorney fees, based on its interpretation of section 3260, subdivision (g) as indicating that attorney fees and costs are to be awarded only if the 2 percent per month charge is awarded, i.e., if a bona fide dispute does not exist and the retention payment is not made within the specified time periods.

■ Darco contends: (1) the trial court abused its discretion in finding there existed a bona fide dispute; there was no bona fide dispute as Darco was entitled to judgment in any event based on the doctrine of substantial compliance; (2) "the Legislature has enacted a prevailing party fee arrangement under the second sentence of subdivision (g)—dependent only upon who is entitled to the retention without regard to the bona fides of the dispute," and Darco is entitled to attorney fees as the prevailing party in this action; and (3) Controlled wrongfully withheld more than 150 percent of the estimated value of the amount in dispute and thus Darco is entitled to both the 2 percent per month charge and attorney fees.

As to the first argument, we find the doctrine of substantial performance to be inapplicable. (See fn. 8, *ante.*) The trial court's ruling was premised on

its finding that both parties reasonably believed subparagraph 8 meant something different, and there was no meeting of the minds. In supplying the missing term, the court determined the flatness required was to be in keeping with industry standards and suitable for the intended use of the dock floor—a requirement more in keeping with Darco's understanding of the contract. The court did not find, however, that Darco's interpretation of the contract was the only reasonable one. As such, the court logically concluded that a bona fide dispute existed. ·

We also disagree with Darco's second contention, that section 3260, subdivision (g) provides for an award of attorney fees to the party entitled to the retention without regard to whether or not a bona fide dispute existed.[10] We agree with the trial court that the inclusion of the sentence regarding attorney fees in the same paragraph as the sentence imposing a charge of 2 percent per month on improperly withheld amounts, indicates the Legislature's intention that attorney fees are to be awarded only in cases in which the retention payments are not made within the required time periods, i.e., where a bona fide dispute does not exist. The sentence begins with the word "additionally," and makes reference to "funds wrongfully withheld," indicating that the attorney fees provision directly relates to the preceding provision imposing a 2 percent per month charge on the "improperly withheld" amount. It would seem that if the Legislature had intended to provide for an award of attorney fees to the prevailing party in every action for collection of retention funds, the provision would have been placed in a separate paragraph. Indeed, as Controlled points out in its cross-respondent's brief, the Senate Committee Notes regarding Senate Bill No. 2515 (1989-1990 Reg. Sess.), which was enacted as section 3260, stated: "This bill would, proponents contend, correct the more blatant abuses and would ensure that subcontractors are paid promptly for their completed work." The 2 percent penalty and the attorney fees provision are directed at the more egregious situation in which a contractor withholds payment of retention proceeds beyond specified time periods and without cause. In contrast, Controlled and Darco were engaged in a bona fide dispute, borne of an ambiguity in the contract in which Controlled believed the entire project had to meet the one-eighth inch in 12-foot standard and Darco believed only the freezer floor needed to be very flat. The trial court eventually resolved the matter in favor of Darco, but premised on the finding that neither party was chargeable with breach of the contract.

Finally, as to whether Controlled withheld more than "150 percent of the estimated value of the disputed amount" (§ 3260, subd. (e)), Darco

---

[10]We note that there are no reported cases interpreting this language.

contends that the "disputed amount" refers to the amount in dispute at the time the retention proceeds are withheld, not to the amount the contractor contends is in dispute at the time of trial. Darco points to evidence that in February 1998, Controlled wrote to Darco and represented that it had estimated the cost of corrective work in June 1997 to be $32,394. Controlled withheld the entire $101,580 retention, more than 150 percent of the estimated cost of corrective work. At trial, Controlled contended the corrective work would cost $200,000 to $300,000.

We agree with Darco's interpretation of the statute. Under section 3260, subdivision (d), which makes reference to subdivision (e), an original contractor has 10 days after it receives the retention payment from the owner to decide whether to release the subcontractor's portion of the retention, and if so how much. *At that time*, "within 10 days from the time that all or any portion of the retention proceeds are received by the original contractor," the original contractor is required to estimate the amount in dispute, and may withhold only 150 percent of that amount. (§ 3260, subd. (e).) Any sums withheld in excess of 150 percent of the "estimated value of the disputed amount" are thus not subject to a bona fide dispute, and are "improperly withheld" beyond the applicable time period. Where such is the case, the prevailing party is entitled to its attorney fees in accordance with the second sentence of subdivision (g).

Darco points to evidence that in a February 1998 letter, Controlled estimated the cost of corrective work in June 1997 to be $32,394. While we are not in a position to make a factual determination regarding the estimated value of the disputed amount 10 days from the time Controlled received the retention proceeds from U.S. Growers, it clearly appears that the $100,000 plus withheld by Controlled was excessive. We therefore remand the matter to the trial court to make the required factual determination, and to reexamine Darco's entitlement to attorney fees as the prevailing party.

V. *The Judgment as to Travelers*

Travelers, which issued to Controlled a statutory contractor's bond,[11] contends that as stated the judgment is improper in that it is entitled to judgment in its favor without condition. The judgment states that "[p]laintiff shall take nothing from . . . Travelers . . . *provided the judgment*

---

[11]Business and Professions Code section 7071.6 provides: "(a) Except as provided in Section 7071.8 and subdivision (b), the board shall require as a condition precedent to the issuance, reinstatement, reactivation, renewal, or continued maintenance of a license, that the applicant or licensee file or have on file a contractor's bond in the sum of seven thousand five hundred dollars ($7,500)."

*awarded herein to plaintiff as against [Controlled] is paid in full.”* (Italics added.)

Business and Professions Code section 7071.5, subdivision (b) provides that "[a]ny person damaged as a result of a willful and deliberate violation of this chapter by the licensee" is entitled to a claim on the bond.[12] As explained above, there existed a good faith dispute regarding Controlled's withholding of the retention proceeds. Thus, Controlled, as licensee, did not violate the licensing statute and Travelers is entitled to judgment in its favor without condition, and to an award of costs.

## DISPOSITION

The judgment is affirmed and modified to reflect that defendant Travelers is entitled to judgment in its favor without condition. The order denying Darco's attorney fees is reversed and the matter is remanded to the trial court for further proceedings in keeping with the views expressed herein. Costs on appeal are awarded to plaintiff Darco and against defendant Controlled.

Hastings, J., and Curry, J., concurred.

---

[12]Within the same chapter, Business and Professions Code section 7108.5 provides, in language very similar to Civil Code section 3260, time limits for payment by a prime contractor of progress payments owing to subcontractors, subject to permissible withholding by the contractor where there exists a good faith dispute over the progress payment. Violation of the provisions constitutes cause for disciplinary action by the state licensing board and subjects the licensee to a penalty of 2 percent of the amount due per month, and also to attorney fees.