**THOR SEAFOOD CORPORATION**

v.

**SUPPLY MANAGEMENT SERVICES, et al.**

No. CV–04–1013–RGK RNBX.

United States District Court, C.D. California.

Jan. 18, 2005.

Robert Renner, Robert J. Zapf, Coudert Brothers, Los Angeles, CA, for Plaintiff.

Alexandra A. Roje, Jane H. Barrett, Piper Rudnick, Los Angeles, CA, for Defendants.

Proceedings: (IN CHAMBERS) DEFENDANT AND COUNTER–CLAIMANT SUPPLY MANAGEMENT SERVICES, INC'S AND AFC ENTERPRISES, INC'S MOTION FOR SUMMARY JUDGMENT (DE 32 and 35)

KLAUSNER, District Judge.

## I. INTRODUCTION

Thor Seafood Corporation, Inc. ("Plaintiff" or "Thor"), a frozen seafood supplier, brings this action against Supply Management Services, Inc. ("SMS"), and AFC Enterprises, Inc. ("AFC") (collectively "Defendants"), for breach of contract. Jeffrey Spotz is the president of SMS and was the vice president of AFC. Charles Maxwell is the president of Thor.

Unless otherwise stated, the following facts are uncontroverted:

On March 10, 2001, SMS contracted with Plaintiff to supply crawfish ("Supply Agreement") for use by AFC, which owns the Popeyes Chicken & Biscuits restaurant chain (SMS is a nonprofit corporation but essentially functions as a purchasing arm for AFC). The Supply Agreement between Plaintiff and SMS specified a three year term, from July 1, 2001 through June 30, 2004, and required Plaintiff to supply 12 containers of crawfish to SMS each year. The Supply Agreement terms defined a year as running from July 1 through June 30. The contract stated that SMS had "the option to adjust quantity of containers purchased for the 2nd and 3rd years of [the contract], based upon buyer's estimate of use for the contract year or in the event crawfish is discontinued as a menu item." The contract further stated that SMS had to notify Thor of any "extra containers no later than March 1st of each year."

Thor bought its crawfish supply from farms in China. Crawfish have a limited annual harvesting season in China, which

runs from the late spring to summer. In order to secure a large volume purchase of crawfish, Thor had to place orders by March 1st of each year. It takes nearly seven million pounds of raw crawfish to produce the twelve containers of frozen crawfish tail meat required each year of the Supply Agreement. Popeyes customers will be glad to learn that, according to Thor, AFC has the most demanding crawfish specifications in the industry. The frozen crawfish tail meat provided was based on AFC's specifications, and could not easily be sold to other customers.

Thor financed its crawfish purchases through Santana Corporation ("Santana"). Jeffrey Spotz, the president of SMS, signed a written consent to the Santana financing arrangement. This consent form required SMS to notify Santana of any modifications to the Supply Agreement. SMS never notified Santana of any contract modifications.

In the first year, Plaintiff delivered 12 containers, which SMS paid for. Near the end of the second year of the contract, SMS determined it would only use six containers that year. In a separate arrangement. SMS essentially financed Thor's attempt to resell the unused containers. Thor was able to resell the unused containers, but Thor only paid SMS $476,317.32, which was $476,502.88 less than the total due under the separate arrangement. Thor withheld the full payment because of the current dispute.

The current dispute involves the amount purchased for the third year of the contract. At some point, SMS and AFC notified Thor that they would only need three or four containers of crawfish for the third year of the agreement. SMS and AFC assert that they notified Thor in the first quarter of 2003, while Thor claims it was not notified until December 2003. AFC and SMS present into evidence emails from and to Thor that demonstrate the parties had discussed reducing the order quantity for the third year. Thor presents into evidence deposition testimony that, in March 2003, an AFC executive assured Thor it would use all twelve containers in the third year. On one printed copy of an email dated February 2003, Spotz handwrote a note: "confirm by 3/1."

After it was notified of the reduced volume, Thor cancelled contracts with its suppliers, which caused it to forfeit some security deposits. Thor now brings the current action, alleging that, under the terms of the contract, AFC and SMS were obligated to notify Thor prior to March 1, 2003 for any volume reductions for the third year of the contract.

## II. *JUDICIAL STANDARD*

Summary judgment is proper only where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). Upon such a showing, the Court may grant summary judgment as to "all or any part thereof." Fed. R.Civ.P. 56(a), (b).

To prevail on a summary judgment motion, the moving party must show there are no triable issues of fact as to matters upon which it has the burden of proof at trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). On issues where the moving party does not have the burden of proof at trial, the moving party is required only to show that there is an absence of evidence to support the nonmoving party's case. *Id.* at 326, 106 S.Ct. 2548.

To defeat a summary judgment, the non-moving party may not merely rely on its pleadings or on conclusory statements. Fed.R.Civ.P. 56(e). Nor may the non-

moving party merely attack or discredit the moving party's evidence. *Nat'l Union Fire Ins. Co. v. Argonaut Ins. Co.*, 701 F.2d 95, 97 (9th Cir.1983). The non-moving party must affirmatively present specific admissible evidence sufficient to create a genuine issue of material fact for trial. *See Celotex Corp. v. Catrett*, 477 U.S. at 324, 106 S.Ct. 2548.

## III. *DISCUSSION*

SMS and AFC argue that the contract is unambiguous, and that it allows SMS to reduce the quantity of crawfish needed without notification. Thor argues that the contract is ambiguous, and that it should be interpreted to require that any reductions to the third year order be noticed by March 1, 2003. Also, Thor asserts that the notice must be formal. Furthermore, Thor argues that there are genuine issues of material fact remaining, which makes summary judgment inappropriate at this time.

### A. *The Contract is Unambiguous On Its Face*

 When a court is required to interpret a contract, the goal should be to discern and enforce the parties' mutual intent at the time the contract was formed. Cal. Civ.Code § 1636; *Bank of the West v. Superior Court*, 2 Cal.4th 1254, 1264, 10 Cal.Rptr.2d 538, 833 P.2d 545 (1992). The court looks to the objective, outward expression of the contract, "rather than a party's unexpressed intention." *Winet v. Price*, 4 Cal.App.4th 1159, 1166, 6 Cal. Rptr.2d 554 (1992). Where the parties dispute the meaning of specific contract language, "the court must decide whether the language is 'reasonably susceptible' to the interpretations urged by the parties." *Badie v. Bank of Am.*, 67 Cal.App.4th 779, 798, 79 Cal.Rptr.2d 273 (1998). Where the contract is clear and explicit, the plain language of the contract governs. *Bank of the West*, 2 Cal.4th at 1264, 10 Cal.Rptr.2d

538, 833 P.2d 545. Extrinsic evidence is only considered to "aid the court in ascertaining the true intent of the parties, not to show that the parties meant something other than what they said but to show what they meant by what they said." *Denver D. Darling, Inc. v. Controlled Env'ts Constr., Inc.*, 89 Cal.App.4th 1221, 1236, 108 Cal.Rptr.2d 213 (2001) (internal quotations omitted). Any contract term susceptible to more than one reasonable interpretation is ambiguous. *Badie*, 67 Cal.App.4th at 798, 79 Cal.Rptr.2d 273. Contract interpretation is a question of law unless the interpretation turns upon the credibility of extrinsic evidence. *Id.* at 799, 79 Cal.Rptr.2d 273; *see also Herring v. Teradyne, Inc.*, 256 F.Supp.2d 1118, 1123–25 (S.D.Cal.2002).

The contract stated that SMS had "the option to adjust quantity of containers purchased for the 2nd and 3rd years of [the contract], based upon buyer's estimate of use for the contract year or in the event crawfish is discontinued as a menu item." The contract further stated that SMS had to notify Thor of any "extra containers no later than March 1st of each year."

 The first quoted term declares that SMS had an option to adjust the quantity of the order for year two and for year three. The second quoted term requires notice before March 1 of the preceding year of any *increases* in the quantity required. The contract is silent as to any notice requirement for reductions in quantity. Plaintiff's asserted interpretation is that the contract requires notice before March 1 of the preceding year of any *increases or decreases* in the quantity required. From the objective, quoted language, Plaintiff's asserted interpretation is unreasonable. The quoted language indicates a mutual intent that SMS had the option to reduce or increase the volume requirements for each year of the contract.

It also indicates a mutual intent that SMS had to notify Thor before March 1 of the preceding year for increases in the volume required. The language shows that the parties considered the possibility of either increases or decreases in volume, and intended that an advance notice would only be required for increases in volume. The objective language indicates that the parties had a mutual intent that Thor would assume the risk of potential volume reductions, while SMS would assume the risk of a need for increased volume after March 1 of each year.

Plaintiff claims that there is at least a genuine issue of material fact for the jury because it has identified contradictory extrinsic evidence, which supports its theory. Specifically, Plaintiff points to the following: (1) the Supply Agreement was drafted by Spotz; (2) the crawfish are supplied from China and orders need to be placed by March 1; (3) AFC has demanding crawfish specifications; (4) Spotz never discussed the notice sentence with Maxwell prior to executing the agreement; and (5) Spotz wrote a note on a printed copy of a February 2003 email that stated, "Need to confirm by 3/1/03."

▮▮ The above identified extrinsic evidence does not directly contradict Defendants' interpretation of the contract. First, the drafter of the contract's identity is irrelevant to whether or not there was an ambiguity. Such information is only relevant to whom to interpret an ambiguity against. Second, that the crawfish supply has a March 1 critical date is something contemplated by the plain language of the contract. Third, AFC's demanding specifications are also contemplated by the contract. Fourth, whether or not the parties actually discussed the notice requirement term is irrelevant. Fifth, Spotz's note on an email printout is indicative of a desire to confirm the quantity before March 1, 2003, but does not actually con-

tradict Defendants' interpretation. Rather, it merely indicates a desire to confirm by March 1, 2003.

▮▮ Moreover, Defendants do not contest the credibility of this extrinsic evidence, which means that the issue continues to be a matter of law appropriate for summary judgment. *See Badie*, 67 Cal. App.4th at 799, 79 Cal.Rptr.2d 273. Plaintiff's arguments amount to using the extrinsic evidence to show that the the the parties "meant something other than what they said," which is an improper use of extrinsic evidence. *See Denver D. Darling, Inc.*, 89 Cal.App.4th at 1236, 108 Cal. Rptr.2d 213 (2001).

Plaintiff's final argument regarding the terms of the contract relates to the notices and modifications procedures provisions. The contract states:

18. NOTICES

Whenever, under the terms of this Agreement, notice is required, the same shall be given in writing and shall be delivered personally, or by certified mail . . . .

19. AMENDMENTS, WAIVERS, AND MODIFICATIONS

▮▮ No change in, addition to, modification or waiver of the terms and provisions of this Agreement shall be binding upon Supplier or SMS unless it is mutually agreed in writing. Any such instrument shall be attached to this Agreement and shall be incorporated herein.

Thor argues that these sections demonstrate the ambiguity of the contract terms. Although this theory is not fully explained in Thor's Opposition, Thor appears to assert that the notices and modifications sections indicate that the parties intended to require a formal notice for any volume reductions.

The notice and modifications sections of the contract do not conflict with Defen-

dants' interpretation of the contract terms. Rather, they indicate that when notice is required (for example, where a volume increase is required) that notice must be in writing and personally delivered. Also, the modifications section is entirely consistent with Defendants' interpretation. A term of the contract was that SMS could increase or decrease its volume orders. It is not a modification for SMS to then exercise its rights under that term. A modification would, for example, be a subsequent agreement that SMS could *not* increase or decrease its volume orders.

The Court finds as a matter of law that the contract did not require advanced notice for a reduction in quantity ordered. This ruling moots Plaintiff's agency claims against AFC.

### B. *The Timing of the Notification*

■ Defendants present credible evidence that supports the conclusion that Thor was aware in the first quarter of 2003 that Defendants would not require twelve containers of crawfish in the third year of the contract. However, Plaintiff presents credible evidence supporting a theory that AFC officials assured him that a full order of twelve containers was required for the third year of the contract. Plaintiff claims he was not notified until December 2003.

Although there is a genuine issue of fact as to when Plaintiff was notified of the volume reduction, this issue is not material in light of the Court's ruling regarding notice. Even if Plaintiff were correct that it did not receive notice until December 2003, the contract indicates that Plaintiff assumed the risk of such a volume reduction.

### C. *Plaintiffs Admitted Debt is Due in Full*

Plaintiff admits that it continues to owe SMS $476,502.88 under a separate agreement, and that it withheld this money in

light of the present dispute. Defendant SMS moves for summary judgment on its counterclaim for these funds. In light of the Court's ruling on the merits of the Plaintiff's claims, Defendant's motion is granted.

### IV. *CONCLUSION*

In light of the foregoing, Defendants' Motions for Summary Judgment are granted.

**IT IS SO ORDERED.**